

Graham Coppes
Emily F. Wilmott
Ferguson Law Office, PLLC
PO Box 8359
Missoula, Montana 59807
Telephone: (406) 532.2664
Fax: (406) 532.2663
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| **YAAK VALLEY FOREST COUNCIL,** | Case No. CV 19-143-M-DWM |
|---|---|
| Plaintiff, | |
| v. | |
| **SONNY PERDUE,** Secretary of Agriculture and **UNITED STATES FOREST SERVICE; U.S. FOREST SERVICE, Northern Region, KOOTENAI NATIONAL FOREST;** and **LEANNE MARTEN, Regional Forester, Northern Region; CHAD BENSON Forest Supervisor, Kootenai National Forest** | **COMPLAINT** |
| Defendants, | |

## INTRODUCTION

1.     The Yaak Valley Forest Council ("YVFC") bring this case against

United States Forest Service, U.S. Forest Service, Northern Region, Sonny Perdue,

Secretary of Agriculture; and Leanne Marten, Regional Forester, Northern Region and Chad Benson Forest Supervisor of Kootenai National Forest (collectively the "Forest Service"); for violating the National System Trails Act ("NSTA"), 16 U.S.C. §§1241-1251, and the Administrative Procedure Act ("APA"), 5. U.S.C. §§551-559. Specifically, the Forest Service has failed to prepare a timely Comprehensive Plan for the Pacific Northwest Trail ("PNT") in violation of Section 5 (e) of the NTSA, failed to reissue the Federal Advisory Committee charter and unreasonably delayed the issuance of the Comprehensive Plan in violation APA Section 706 (1), and arbitrarily, capriciously and in violation of NTSA relied on the Kootenai National Forest Plan ("KNF Plan") in lieu of preparing comprehensive plan in violation of the APA.

2.      In June of 1980, the Forest Service and the National Park Service ("NPS") issued a report based on a joint study on the feasibility of designating the PNT. The findings of the study concluded that the PNT was neither feasible nor desirable and recommended the "no trail" alternative. The study specifically found that the development of the PNT "would likely have a major adverse impact on the endangered grizzly bear and on the many fragile high elevation areas the trail would cross." Subsequently, upon the submission of the study to Congress, they declined to designate the PNT.

3.      Approximately nineteen years later, on March 30, 2009 Congress enacted the Omnibus Public Land Management Act of 2009, Pub.L. 111-11. A Title V of the Omnibus Public Land Management Act of 2009 designated six trails to the National Trail System, including the PNT. Section 5 (e) of the NTSA mandates the Forest Service to issue a Comprehensive Plan ("CP") within two years of the Congressional designation.

4.      It was not until 2016, pursuant to the Section 5 (d) of NTSA and through the Secretary of Agriculture in accordance with the provisions of the Federal Advisory Committee Act ("FACA") as amended, 5 U.S.C. App. 2., did the Forest Service enact the Charter for the Pacific Northwest National Scenic Trail Advisory Council ("Council"). The intention of the Council is to help develop the statutorily mandated Comprehensive Plan. In 2018, the Council's charter expired, and the committee became inactive.

5.      As of today, ten years after Congress designated the PNT and eight years after the statutory deadline for the CP passed, the Council remains inactive, the charter has not been renewed and the Forest Service has yet to publish a Comprehensive Plan.

6.      YVFC has engaged in numerous correspondence with the Forest Service regarding the PNT and issuance of the Comprehensive Plan. As explained below, the Forest Service is unreasonably delaying the renewal of the Council's

charter, unreasonably and/or illegally delayed the issuance of the Comprehensive

Plan and arbitrarily and illegally relying on the KFP in lieu of issuing a CP.

7.     Through this litigation, the YVFC asks the Court for an order

providing expedited deadlines for the Forest Service to prepare a timely

Comprehensive Plan for the PNT and an order enjoining the agency from

advertising use of the designated rout until the CP and NEPA analysis is

accomplished.

## JURISDICTION AND VENUE

8.     This action arises under the NSTA,16 U.S.C. §§1241 *et seq.*, and

APA, 5 U.S.C. §§551, 701-706. This Court has jurisdiction pursuant to 28 U.S.C. §

1331 (federal question jurisdiction), 28 U.S.C. §§2201-2202 (declaratory

judgments and further relief) and 5 U.S.C. § 702 (APA).

9.     Venue in this Court is proper under 28 U.S.C § 1391 (e) because

portions of the PNT are located in the Flathead, Kootenai, and Idaho Panhandle

Forests in the USDA Northern Region, in the Kootenai National Forest and Forest

Service Region 1 Offices are located in this District.

## PARTIES

10.     Plaintiff YAAK VALLEY FOREST COUNCIL, ("YVFC"), is a

Montana Nonprofit organization dedicated to the protection of the ecological

4

integrity of the Yaak Valley and the Kootenai National Forest, home to important habitat for native and sensitive species. YVFC also aims to encourage and support the development of local economies based on stewardship principles, value-added forest products, habitat conservation and ecological restoration of the Yaak Valley and Kootenai National Forest.

11.    YVFC was formed in 1997 in Yaak, Montana where local residents raised concerns with the health and management of the neighboring forest lands. Because the YVFC values the Yaak Valley grizzly bear and its presences in the Yaak Valley and Kootenai National Forest, YVFC places high priority on protecting core habitat and recovering the grizzly bear throughout the Yaak Valley.

12.    YVFC's supporters—including its Board members, supporters and staff—live, work, recreate, study and otherwise use and enjoy the Yaak Valley and Kootenai National Forest. YVFC is led by residents of the Yaak Valley who know the landscape intimately, who have high level of field experience and share a commitment to conservation and restoration of the valley.

13.    YVFC has worked in a collaborative fashion with area stakeholders and the Montana delegation to support backcountry, primitive, non-concentrated recreation in various areas of the valley's roadless cores, and have long advocated for conservation and protection of the Cabinet-Yaak threatened grizzly population.

14.     Defendant SONNY PERDUE is the Secretary of Agriculture. The Secretary of Agriculture is responsible for the administration of designated trails under the NSTA, including the development of the statutorily mandated comprehensive management plan under Section (e) and subsequent promulgation of regulations for management of the PNT. Secretary of Agriculture is also tasked with the selection of final rights-of-ways for the PNT. He is sued in his official capacity.

15.     Plaintiff standing to seek relief in this Complaint is demonstrated by the declaration of Rick Bass, chair board of YVFC.

16.     Defendant LEANNE MARTEN, is the Regional Forester for the Northern Region. The Regional Forester is tasked with the management of the Kootenai National Forest.

17.     Defendant CHAD BENSON, is the Forest Supervisor, Kootenai National Forest. The Forest Supervisor is in charge of the Kootenai National Forest.

## STATEMENT OF FACTS

### A. THE NATIONAL TRAILS SYSTEM ACT AND PACIFIC NORTHWEST TRAIL DESIGNATION

18.     The National Trails System Act (NTSA) was first passed in 1968 with the goal of promoting outdoor recreation experiences and "the preservation of,

public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation." 16 U.S.C. § 1241(a).

19.    Before designating a trail, NTSA Section 5(b) requires the determination of the feasibility and desirability of designating the trail. A feasibility study "shall be determined on the basis of an evaluation of whether or not it is physically possible to develop a trail" and "whether the development of the trail would be financially feasible." 16 U.S.C. § 1244 (b).

20.    NTSA Sec. 5 [16 U.S.C. 1244] (e)/(f) … "Within two complete fiscal years of the date of enactment of legislation designating… the Secretary shall...submit...a comprehensive plan for the acquisition, management, development, and use of the trail, including but not limited to, the following items: (1) specific objectives and practices to be observed in the management of the trail, including the identification of all significant natural, historical, and cultural resources to be preserved... and… an identified carrying capacity of the trail and a plan for its implementation."

21.    Sections 5(e) and 5(f) of the NTSA outline the requirements for newly established trail comprehensive management plans (CMPs). Each section begins with calls for "specific objectives and practices to be observed in the management of the trail . . ." and ends with the phrase, "… and an identified carrying capacity for the trail and a plan for its implementation."

7

22.    Carrying capacity is a crucial determination to protect the ecological integrity of the lands surrounding these trails, as well as determining a threshold for human safety. Generally, carry capacity is the maximum amount of human use beyond which resource deterioration or human crowding are likely to occur. The USFS has stated:

> Carrying capacity, in simple terms, is an expression of the number of people and/or horses that can use an area and its facilities without damaging resources (soil, water, vegetation, wildlife, etc.) Carrying capacity may also include a measurement of the maximum acceptable level of social contact among visitors in an area. This aspect is of special importance in Wilderness or primitive areas where "solitude" is a major part of the desired recreational experience.

An inquiry into the carry capacity of a National Scenic Trail is an important aspect of trail planning, identifying trail use, overuse and conflicting. This is normally regulated through the issuance of trail permits.

23.    Established carrying capacity should be a measure that may be subject to adjustment over time as the information base is refined. The comprehensive plans are normally revisited by the agency and established trail associations to ensure outlined trail objectives are being met and whether instituted measures are still sufficient in protecting the ecological integrity of the trails and surrounding area.

8

24.     For example, in 1978 Congress passed P.L. 95-625 requiring a

Comprehensive Plan for the Pacific Crest Trail ("PCT").   In 1982, the USFS

issued its Comprehensive Management Plan for the PCT. Based on the CP analysis

the USFS determined as set number of permits that may be issued daily depending

upon what segment is being traversed.  After the issuance of the CP, the USFS and

PCT association have issued updated "Strategic Plans" every few years to help

meet the demands of increased usage. Since 2013, the total number of permits

issued on the PCT has more than tripled and has been continuously monitored to

ensure compliance the objectives and measures established in the initial CMP.

25.     In the instant case, the carry capacity serves as a vital finding in

allowing increased numbers of humans to access very remote, sensitive ecosystems

home to a variety of federally protected endangered species. Specifically, the

carrying capacity in the PNT would consider the effects of increased human use on

grizzly bears, their core habitats and human-bear interaction.

26.     The Pacific Northwest Trail is a continuous route from the

Continental Divide in Montana to the Pacific Ocean in Washington. The PNT is

approximately 1200 miles long and passes through seven National Forests, three

National Parks, a BLM resource area, lands managed by Washington Department

of Natural Resources, Idaho Department of Lands, Washington State Parks, Idaho

State Parks and small sections of private land.

27.     The PNT was first proposed in the 1970s. In 1974, PNT enthusiasts teamed up with Seattle congressman to designate the trail.

28.     In 1977, Congress authorized a study to determine the feasibility and desirability of constructing the Pacific Northwest Trail (PNT). The study was conducted jointly by the National Park Service and U.S. Forest Service.

29.     The 1980 Feasibility Study proposed four alternatives: (1) the most scenic route, (2) the least costly route, (3) the route having the minimum environmental impact, and (4) no trail. The study concluded that the PNT "would have the scenic and recreational qualities needed for designation as a National Scenic Trail, but concluded that its construction was neither feasible nor desirable and recommend the "no trail" alternative. In conjunction with financial concerns, the study noted that "there would be significant environmental impacts on the grizzly bear and on fragile and frequently over-utilized high elevation areas."

30.     Despite the findings of the feasibility study, PNT enthusiasts continued to pursue it designation. In 2008, Congressman Dicks and Senator Cantwell introduced legislation to designate the full length of the PNT as a national scenic trail. On March 20, 2009, the Omnibus Pulbic Land Management Act of 2009 was signed into law designating the PNT.

31.     Notwithstanding the statutory mandates of the NTSA Sections (d) and (e) the Forest Service failed to publish a comprehensive management plan,

initiate an advisory committee or implement any trail administration until its call

for an advisory committee in 2015.

32.　　Finally on November 21, 2017, a Draft Pacific Northwest National

Scenic Trail Comprehensive Plan Outline was published. The four-page document

provided a cursory bullet point layout of what the plan would include with

highlighted comments to the corresponding statutory sub-section. See Exhibit A.

The draft outline delineated what specific portions of the plan were "specially

called out in the NTSA as matter on which the Secretary shall consult with the

Advisory Council." See Exhibit. Pg. 1. One of these included the "Carrying

Capacity" and "Plan for Implementation of Carrying Capacity."

33.　　In 2017, it was estimated that 100 hikers completed the PNT without a

comprehensive management plan in place. THREE RIVERS RANGER DIST.,

KOOTENAI NAT'L FOREST, U.S. FOREST SERVICE, BLACK RAM ENVIRONMENTAL

ASSESSMENT, 190 (July 2019).

34.　　To date, there has been no Comprehensive Plan, draft or otherwise,

published or NEPA analysis conducted on the PNT.

## B. THE SELKIRK AND CABINET-YAAK GRIZZLY BEAR POPULATION

35.　　Nestled in the Kootenai National Forest, in the extreme northwest

corner of Montana, lies the Yaak Valley. The Yaak Valley is located at the

southern terminus of the Purcell Mountain Range in northwest Montana. The Yaak

Valley's low elevation and high precipitation result in a climate described as

"modified Pacific maritime" in character. Large larch, cedar, hemlock, spruce,

Douglas, grand and alpine fir, ponderosa, lodgepole and whitepine fill the

landscape.

36.     The Kootenai National Forest is home for an abundance of wildlife. It

is also a vital link in the chain of wildlands that sweep north into Canada.

Inhabitants include grizzly bears, wolves, lynx, mountain lions, wolverine, marten,

fisher, mountain goats, great gray owls, bull trout, westslope cutthroat trout and

inland redband trout.

37.     The Yaak is considered by many conservation biologists to be key

habitat for grizzly bear recovery in regards to providing linkage to other core

recovery areas in all directions, including the Northern Continental Divide

Ecosystem (includes Glacier/Bob Marshall populations), Selkirk Ecosystem (North

Idaho) and the population in eastern and central Washington, as well as the

Bitterroot Recovery Area and the larger grizzly populations in southern British

Columbia.

38.     The Yaak Valley is one of only six grizzly bear recovery areas in the

lower forty-eight states, and has a moderate level of scientifically documented

grizzly bear activity. With estimates of only 44-54 grizzly bears remaining, the

Cabinet/Yaak Grizzly Bear Recovery Area contains the lowest elevation grizzly population, as well as the most imperiled population, in North America.

39.   There are two recovery zones that overlap in the KNF: the Cabinet-Yaak Recovery Zone (CYRZ) and the North Continental Divide Recovery Zone (NCDE). The CYRZ is located in the KNF, IPNF, and a small portion of the Lolo National Forest.

40.   Grizzly bears occupy additional areas outside the core recovery zones (BORZ). Particularly, a bear management area located in the KNF named the Cabinet Face, 27,093 acres, a total of 164 miles within NFS lands with 130 miles of that being open roads. USFS, FINAL ENVIRONMENT'L IMPACT STATEMENT FOR THE REVISED LAND MGMT PLAN KOOTENAI NAT'L FOREST (Aug. 2013) at pp. 247.

41.   The goal for grizzly bear management is to provide sufficient quantity and quality of habitat to facilitate grizzly bear recovery. An integral part of the goal is to implement measures within the authority of the Forest Service to minimize human-caused grizzly bear mortalities

42.   51% of the 1156-mile route proposed in 2016 for the 2009 Congress-approved Pacific National Trail (PNT) will pass through four of the six U.S. Grizzly Bear Recovery Zones. Nearly 7% (76 miles) of the total length of the northern PNT will pass through the CYGBRZ, with about 6% (68 miles) through our Yaak grizzly bear-PNT study area. FRANK L. CRAIGHEAD & WAYNE P.

McCrory, Potential Impacts of the Proposed Pacific Northwest National Scenic Trail Route on the Threatened Grizzly Bears and Their Recovery in the Yaak Watershed Area, NW Montana pp. 11 (2018).

43.     Currently, Yaak is estimated to have only 20-35 grizzly bears, among the lowest density of interior North American populations. In the northern Yaak, some grizzly bears have home ranges shared with British Columbia.

44.     Recovery BMUs have been designated for grizzly bears in the CYGBRZ as part of recovery planning. Each BMU approximates the size of a female grizzly bear home range, including all seasonal (spring, summer, fall, winter den) habitat components.

45.     The PNT as currently designated passes through three BMUs with demonstrated occupancy by female grizzly with young. The northern Yaak BMUs have the most female grizzlies with young occupancy compared to the southern Yaak, likely reflective of higher value seasonal habitats and less human disturbance. Telemetry studies indicate some female grizzly bear home ranges have concentrated activities in the northern PNT area. Craighead-McCrory at 11.

46.     The IGBC Taskforce identified the importance of secure areas to grizzly bears. The Taskforce defined "core areas" as those areas with no motorized access or heavily used foot/livestock trails, providing some level of secure habitat.

Research suggested that the core areas in the CYE be at least 55 percent of the land area in a Bear Management Unit.

47.     The PNT route was deliberately routed to include as many higher elevation scenic mountains as possible in the northern Yaak. This means a higher degree of overlap with summer, fall and den habitats will occur than if alternate routes at lower elevations would have been chosen. CRAIGHEAD-MCCRORY at 10.

48.     It is estimated 24 miles or 35% of the northern PNT in the Yaak will cross low elevation areas (below 4,590 feet) where spring habitat types would occur, while the balance (44 miles or 65%) of the total PNT length overlaps with other seasonal habitat elevation zones. All the non-spring habitat (44 miles or 65%) is considered a fall habitat zone (above 4,590 feet—except for some grizzly use of ungulate carcasses at lower elevations in November). A subset of that (37 miles or 54%) is considered summer habitat above 4,929 feet. At the highest elevations (26 miles or 38%), the route is in winter den habitat beginning at elevations above 5,580 feet. CRAIGHEAD-MCCRORY at 12.

49.     The use of the PNT may result in displacement of grizzly bears from critical habitats, with a high potential for significant adverse effects on survival and population recovery of the threatened Yaak grizzly bears. CRAIGHEAD-MCCRORY at 13.

50.     Without a Comprehensive Plan, the impacts to these grizzly populations are unknown, and management objectives and measures have not been established to alleviate the adverse effects to the protected species. Furthermore, without a comprehensive plan there has been no ESA Section 7 consultation.

## FIRST CLAIM FOR RELIEF

**NTSA Section 5(e): Failure to prepare a comprehensive management plan for the Pacific Northwest Trail**

51.     YVFC hereby realleges and incorporates all preceding paragraphs.

52.     Section 5(e) of the NTSA requires that the Secretary shall submit a comprehensive management plan "within two complete fiscal years of the date of enactment of legislation designating a national scenic trail."

53.     Section 5(e)(1) specifically requires that this comprehensive management plan include specific "objectives and practices to be observed in the management of the trail, including the identification of all significant natural, historical, and cultural resources to be preserved…and for national scenic or national historic trails an identified carrying capacity of the trail and a plan for its implementation…"

54.     The USFS states that *administration* of the PNT "includes leadership in the development of the statutorily required trailwide Comprehensive Plan which

provides strategic direction for administration and management of the PNT."
*Pacific Northwest Trail Questions and Answers*, U.S. Forest Service (June 2018)
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd586067.pdf

55.     The Pacific Northwest Trail was designated in 2009.

56.     USFS has yet to prepare such Comprehensive Plan for the PNT.

57.     USFS has yet to issue any formal consultation documents in which
they identify objectives and practices in managing the PNT, all significant natural,
historical and cultural resources to be preserved, nor have they identified carrying
capacity of the trail.

58.     USFS acknowledges that "[t]here's more work needed to determine
what the right capacity is but early indications suggest a long distance/thru-hiker
capacity of about 400 people per year. *Pacific Northwest Trail Questions and
Answers*, U.S. Forest Service (June 2018)

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd586067.pdf

59.     Because more than two years have passed since the PNT designation,
the USFS has violated its nondiscretionary duty to prepare a comprehensive plan
under NTSA section 5(e); 16 U.S.C. § 1244(e). The Forest Services' failure and/or
refusal to prepare a comprehensive plan for the PNT is "arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with the law" and/or constitutes

"agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§706 (2)

(1), 706 (1).

## SECOND CLAIM FOR RELIEF

**APA Section 706 (1): Failure to reissue FACA charter and unreasonably delay the issuance of a Comprehensive Plan**

60.     YVFC hereby realleges and incorporates all preceding paragraphs.

61.     Pursuant to Section 5 (d), the Forest Service is required to establish an

advisory council "*within one year* of the date of the addition of any national

scenic...trail." 16 U.S.C. § 1244 (d).

62.     This advisory committee shall expire ten years from the date of its

establishment. 16 U.S.C § 1244 (d). If the Forest Service is unable to establish

such an advisory council because of "lack of adequate public interest, the Secretary

*shall* so advise the appropriate committees of the Congress. *Id.*

63.     After the PNT's designation in 2009, the first advisory committee was

not established until 2016.

64.     The Charter for the Pacific Northwest National Scenic Trail Advisory

Council (Council) was established pursuant to the implementation of Section 5(d)

of the National Trails System Act (Act) (Pub. L. 90-543) as amended through

(Pub. L. 111-11) (16 U.S.C. §§ 1241 to 1251), and the Secretary of Agriculture in

accordance with the provisions of the Federal Advisory Committee Act (FACA) as amended, 5 U.S.C. App. 2.

65.     This advisory committee met three times over two years and was inactive pending the expiration of the charter filed September 07, 2016.

66.     Paragraph 11 of the Charter states that it will "expire 2 years form the date it is filed, unless it is renewed prior to that in accordance with FACA, Section 14. The Council will not meet or take any action without a valid current charter."

67.     The most recent charter expired on September 07, 2018. There currently exists no active Advisory Council and the PNT Charter has not been renewed.

68.     41 C.F.R. § 102-3.60 allows for the reestablishment of the Council. Forest Service has continued to stall the reestablishment of this charter, alleging a hold up by the U.S. Department of Agriculture and the implications of Executive Order 13875.

69.     In the absence of an active PNT Advisory Council and proposed Comprehensive Plan, the USFS continues to promote the use of thru-hiking on the PNT and approximates the current long-distance use of the PNT is 65-100 people per year.[1]

---

[1] This number has not been officially verified by the Forest Service or by their partner University of Montana who has been tasked to monitor and evaluate use pattern of the PNT. The Forest Service has highlighted that increase in trail use is

70.     The Forest Service has a nondiscretionary duty to establish an

Advisory Committee and subsequently produce a Comprehensive Plan. In

violation of Section 5 (d) of NTSA, the Forest Service has provided no rationale

for their delay in reauthorizing the charter and failing to meet its statutory

deadlines.

71.     The Forest Service's failure and/or refusal to establish an Advisory

Committee is a violation of Section 5 (d) and is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law" and/or constitutes "agency

action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§706 (2) (1), 706

(1).

## FOURTH CLAIM FOR RELIEF

**The Forest Service "reliance" on the Kootenai National Forest Plan in lieu of
developing a comprehensive plan violates the statutory mandate of Section 5
(e) and is arbitrary and capricious.**

72.     YVFC hereby realleges and incorporates all preceding paragraphs.

73.     In lieu of developing the comprehensive plan, the USFS has stated

that "Kootenai Forest Plan guides our management of the congressionally

---

likely and "early indications suggest a long distance/thru-hiker capacity of about
400 people per year." *See Pacific Northwest Trail Questions and Answers*, U.S.
Forest Service (June 2018)
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd586067.pdf

designated PNT. The comprehensive planning process for the PNT allows the KNF to continue to carry out its management responsibilities along the PNT (signing, maintenance, or site-specific projects) concurrently." Exhibit B USFS Ltr Forest Supervisor (dtd 07/08/19).

74.     Such statement belies the importance of a comprehensive plan to identify a specific carrying capacity of the PNT. Section 5(e)(1) NSTA requires that the comprehensive plan identify the trail's carrying capacity and plan for implementation. The number of people and when access to the PNT is allowed, as well as any special permitting requirements is an imperative in complying with NSTA, ESA, NFMA and KNF Plan.

75.     The science is clear, encounters with people or anthropogenic food and attractants rank among the greatest risk factors for grizzly bears. KNF Forest Plan Revision BiOp Ch. II-74. Human-cause mortality is among the top threat identified in the Grizzly Bear Recovery Plan.

76.     In recognition of this threat, Forest Service issued the Motorized Access Management in Selkirk and Cabinet Yaak Grizzly Bear Recovery Zones EIS and ROD ("Access Amendment") which amended the KNF Forest Plan. The Access Amendment provides large areas with limitation on motorized use in order to reduce human presence and related impacts to grizzly bears. This management amendment, however, only addresses human presence through the use of open

motorized routes, not human presence by way of increased trail usage from through-hikers on the PNT.

77.     The Access Amendment specifically acknowledges that "[o]pen roads, vegetation and fuel projects, and high-use recreational areas such as trails or campground are examples of activities that reduce the amount of secure habitat that is available and may result in displacement of bears." KNF Access Amendment ROD at pp. 2

78.     The ROD specifically defines "Core Area" as a secure habitat within a BMU that contains no motorized travel routes or high use non-motorized trails during the non-denning season." *Id.* at 10. The non -denning season for the CYE recovery zone includes the dates 4/1-11/15. *Id.*

79.     In complying with the IGBC and Selkirk/Cabinet-Yaak Ecosystem Subcommittee (1988) direction, the USFS laid out specific parameters for establishing and managing core habitat in all BMUs. The first parameter states that core areas must "include high quality habitat within a BMU that contains no motorized travel routes or ***high use trails.***" (emphasis added). *Id.* at 60. The Access Amendment is clear BMU parameters prohibit high use trails.

80.     As currently planned, the PNT route through three BMUs with demonstrated occupancy by female grizzly with young. While the daily use of these trails are unknown, the USFS estimates 100 hikers frequented the PNT in

2017 and predict upwards of 400 people per year and is "steadily growing." PNTA Assc. FAQ. Thru hiking on the PNT normally begins in early July and continues through October, these dates corresponded with the CYE grizzly non-denning season. These BMUs areas contain trails that are infrequently used and are habitat to bears who are unfamiliar and highly sensitive to limited human interaction, let alone 400 people per year.

81.   The KNF Revised Forest Plan nor Access Amendment address the PNT or potential impacts from increased trail use in core areas of grizzly bear habitat, The associated Biological Opinion is also void of any adverse effect analysis on the CYE or NCDE grizzly bear population from increased trail access and usage by humans on the PNT route in the high-alpine regions of the KNF.

82.   The Biological Opinion specifically states that the opinion "does not provide an analysis of effects [on grizzly bears] for specific actions. Future actions undertaken by the KNF will undergo detailed analysis and further public comment as part of the site-specific NEPA process and will undergo consultation under section 7 of the ESA as appropriate." BiOp II-1.

83.   The BiOp only provided analysis for the motorized route densities and the over-snow motorized use. The remaining analysis is a broad-scale examination of the types of projects and activities conducted under the Revised plan. The KNF is responsible for section 7 consultation on all future projects that may affect the

grizzly bear or its habitat, even if those projects are consistent with the Revised Plan. BiOp II-49.

84.     Furthermore, as required by NFMA and the 2012 planning rule, all projects and authorized by the Forest Service after approval of the KNF Revised Plan must be consistent with the applicable plan components. 16 U.S.C. 1604(e); CFR 219.17 of 2012 Planning Rule. The BiOp only provided broad-scale analysis of other site-specific projects and did not address adverse effects of increased hikers in high elevation alpine habitat.

85.     The Forest Service has subverted its non-discretionary duty to prepare a comprehensive plan for the PNT, ignored its own conclusions in the KNP Revised Plan, and illegally relied on the KNF Forest Plan Revision in meeting its NFMA and ESA Section 7 requirements.

86.     The Forest Service's reliance on the KNF Revised Plan as a substitute for a Comprehensive Plan is a violation of Section 5 (d) and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" 5 U.S.C. §§706 (2) (1).

## FIFTH CLAIM FOR RELIEF

**The Forest Service should be enjoined from promoting the use of the PNT until a Comprehensive Plan has been completed**

87.     The Forest Service maintains and operates the website https://www.fs.usda.gov/pnt.

88. The Forest Service through its website advertises the use of the PNT, provides links and access to information on traversing the PNT provided on other non-governmental organizations, such as the https://www.pnt.org/.

89. These endorsement and publications by the USFS should be enjoined until the USFS properly conducts a Comprehensive Plan in order to determine trail objectives and carrying capacity.

## PRAYER FOR RELIEF

YVFC respectfully request that the Court grant the following relief:

I. Declare and adjudge that the Forest Service acted arbitrarily and illegally by failing to prepare a timely comprehensive plan for the PNT, in violation of NSTA Section (e), 16 U.S.C. §1244(e);

II. Remand for the Forest Service to prepare a comprehensive plan for the PNT according to an expedited timetable established by the Court;

III. Declare and adjudge that the Forest Service acted arbitrarily and illegally by relying on the KNF Plan in lieu of a comprehensive plan and NEPA analysis has failed to meet ESA's Section 7 affirmative duty to reinitiate consultation in violation of the APA, 5 U.S.C. § 706 (2) (A);

IV. Declare and adjudge that the Forest Service by relying on the KNF Plan in lieu of a comprehensive plan and NEPA analysis has violated its affirmative duty under NFMA in violation of the APA, 5 U.S.C. § 706 (2) (A);

V.     Declare and adjudge that the Forest Service violated the APA by unreasonably delaying and/or illegally withholding the issuance of the PNT Comprehensive Plan and NEPA analysis.

VI.     Enjoin the Forest Service from promoting the public's use of the PNT as a thru-hike until a comprehensive plan is issued.

VII.     Award the YVFC its reasonable fees, costs and expenses associated with this litigation under 28 U.S.C. § 2412 and

VIII.   Grant such further and other relief as the Court deems just and proper to remedy the Forest Service's violations of law.


Respectfully submitted this 23rd day of August, 2019.

Emily F. Wilmott
Graham Coppes
FERGUSON LAW OFFICE, PLLC
PO Box 8359
Missoula, Montana 59807
(406) 532.2664
406) 532.2663
emilyw@fergusonlawmt.com

*Attorney for Plaintiff*