Graham Coppes
Emily F. Wilmott
Ferguson Law Office, PLLC
PO Box 8359
Missoula, Montana 59807
Telephone: (406) 532.2664
Fax: (406) 532.2663
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| YAAK VALLEY FOREST COUNCIL, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 9:19-cv-143-DWM |
| v. | ) ) ) | |
| SONNY PERDUE, Secretary of Agriculture; UNITED STATES FOREST SERVICE; U.S. FOREST SERVICE, Northern Region; KOOTENAI NATIONAL FOREST; LEANNE MARTEN, Regional Forester, Northern Region; CHAD BENSON, Forest Supervisor, Kootenai National Forest, | ) ) ) ) ) ) ) ) ) ) | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| Federal Defendants. | ) ) | |

TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    **A. Purpose and Requirements of the National Trails System Act** . . . . . . . 3

    **B. Pacific Northwest Trail Designation and Agency Failures** . . . . . . . . . . 5

    **C. PNT Impacts to Grizzly Bear** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    **A. The Service's failure to prepare a comprehensive management plan
       nearly eleven years after the PNT was designated is an unreasonable
       delay** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    **B. The Forest Service may not rely on Kootenai National Forest Plan for
       PNT projects without initiating Section 7 Consultation**. . . . . . . . . . . . 19

    **C. This Court should enjoin the Forest Service from promoting the use of
       the PNT as a thru-hike until a Comprehensive Plan has been completed**
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

REMEDIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATION OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF AUTHORITIES

*Alliance for the Wild Rockies v. Zinke*,
    265 F.Supp.3d 1161 (D. Mont. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Alliance for the Wild Rockies v. Probert et al.*
    412 F. Supp. 3d 1188 (D. Mont. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Amoco Prod. Co. v. Village of Gambell, AK*,
    480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Brower v. Evans*,
    257 F.3d 1058, 1068 (9th Cir. 2001) . . . . . . . . . . . . . . . . . 11, 14, 15, 17, 19

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
    575 F.3d 999 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ctr. for Biological Diversity v. Norton*,
    304 F.Supp.2d 1174 (D.Ariz.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*City & Cty. of San Francisco v. United States*, 1
    30 F.3d 873 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Connor v. Burford*, 848 F.2d 1441
    (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cottonwood Envtl. Law Ctr. v.USFS*, 7
    89 F.3d 1075 (9th Cir.2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 25, 27

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*eBay Inc. v. MercExchange*, L.L.C.,
    547 U.S. 388, 391 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Envtl. Def. Ctr. v. Babbitt*,
    73 F.3d 867 (9th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 25

*Hispanic Affairs Project v. Acosta*,
    263 F. Supp. 3d 160 (D. D.C. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hispanic Affairs Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Independence Mining Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*In re American Rivers and Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Int'l Chem. Workers Union,
    958 F.2d 1144 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

In re Core Communications, Inc.,
    531 F.3d 849 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . 12

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
    305 F.R.D. 256 (D.N.M. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mashpee Wampanoag Tribal Council Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Occidental Eng'g Co. v. INS,
    753 F.2d 766 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rock Creek All. v. U.S. Fish & Wildlife Serv.*,
    390 F.Supp.2d 993 (D. Mont. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sierra Club v. United States Forest Serv.*,
    843 F.2d 1190 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Sierra Club v. Marsh,*
    872 F.2d 497 (1st Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Telecommunications Research & Action v. FCC (TRAC),*
    750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 12

*Tennessee Valley Authority v. Hill,*
    437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20, 25

*Thomas v. Peterson,*
    753 F.2d 754 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27


5 U.S.C. §§ 555(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16 U.S.C. § 1241(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. 1244(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 14, 16

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

50 C.F.R. § 402.01(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

64 Fed. Reg. 26732. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>INTRODUCTION</u>

In the extreme northwest corner of Montana, tucked amongst primordial temperate rainforests, lies the Yaak valley.  Home to an abundance of wildlife, this region represents one of Montana's most unique ecosystems.  Large larch, cedar, hemlock, spruce, Douglas, grand and alpine fir, ponderosa, lodgepole and whitepine fill the rises and folds of the land.  Here, water rich weather systems from the Pacific collide with the abrupt mass of the Rocky Mountains, releasing moisture that creates a rich forest biomass not seen in other parts of the state.  The region and its wildlife are bisected by the Kootenai River, with the Cabinet Mountains to the south, and the Yaak valley to the north.  In these dripping woods, species from the Pacific Northwest forests and the Rocky Mountains live side by side.  One such species is the grizzly bear.

Grizzly bears were listed as a threatened species in 1975 in the conterminous 48 States.  Currently grizzly bear distribution has been reduced to five areas in the western United States, including the Cabinet-Yaak Ecosystem, which is identified by the United States Fish and Wildlife service as recovery zone. Unlike the Northern Continental Divide Ecosystem, and the Greater Yellowstone Ecosystem, which have Glacier and Yellowstone national parks at their core, the CYE has highways, rivers, railroads, towns, and communities scattered throughout the recovery zone.

Nevertheless, the Yaak is considered by many bear biologists to be a key habitat for grizzly bear recovery as it provides linkage to other core recovery areas in all directions. Listing of these bears under the endangered species act was necessitated by the long history of extractive resource damage that fractured this habitat with clear cuts and roads. By the 1980s, only a few CYE grizzly bears remained and in 1998 the grizzly bear population in the Cabinet Mountain portion of the CYE was estimated at fewer than 15 bears.

Because of this fragility, there is a lengthy historic context related to concerns of the potential impacts of the Pacific Northwest Trail ("PNT" or "Trail") on grizzly bears. As early as 1978, Dr. Chuck Jonkel (head of the Border Grizzly Project) carried out an independent review which concluded that precarious nature of the grizzly bears along the portions of the route near the Yaak could not sustain the increased pressure commensurate with a National Scenic Trail. In fact, the study stated that "our strongest recommendation is that the trail swing far to the south to avoid both the prime and precarious grizzly range." Two years later, the United States Forest Service ("USFS" or "Service") and the National Park Service released a joint assessment of the proposed PNT, ultimately recommending that no trail be built for several reasons, including harm to grizzly bears.

By 2009, with the CYE grizzly bear recovery plan well underway, the PNT was endorsed by Congress as a national trail in spite of opposition from the public

and federal and state wildlife agencies. It had undergone a sudden revival when Congress added it to the 2009 National Trails Act when it passed in Section 5205 of H.R. 146 of the Omnibus Public Land Management Act.

Today, Plaintiff Yaak Valley Forest Council ("YVFC") is one of the 23 groups sitting on the PNT advisory committee. Despite the promised planning process to look at PNT route alternatives and carry out a detailed Environmental Impact Statement, YVFC found that the USFS had done nothing but promote the unregulated use of the Trail. It is from this history that YVFC seeks judicial review of the Service's inaction under the Administrative Procedures Act and requests enjoinder of the Service's continued promotion of unregulated use of the Trail.

BACKGROUND

## A. Purpose and Requirements of the National Trails System Act

The National Trails System Act ("NTSA") was first passed in 1968 with the goal of promoting outdoor recreation experiences and "the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation." 16 U.S.C. § 1241(a). Once a trail is designated by Congress, the Secretary, "after full consultation with affected Federal land managing agencies, the Governors of the affected States, [and] the

relevant advisory council…" is tasked with developing and submitting a comprehensive management plan ("CP"). 16 U.S.C. 1244(e).

NSTA further prescribes specific CP requirements and a deadline for the plan's completion. NTSA Section 5 states that "[*w]ithin two complete fiscal years* of the date of enactment of legislation designating… the Secretary *shall*...submit...a comprehensive plan for the acquisition, management, development, and use of the trail, *including* but not limited to, the following items:

(1) specific objectives and practices to be observed in the management of the trail, including the identification of all significant natural, historical, and cultural resources to be preserved, details of anticipated cooperative agreements to be consummated with other entities, and an identified carrying capacity of the trail and a plan for its implementation." (emphasis added). 16 U.S.C. 1244 (e).

Pursuant to Section 5, the CP must, at a minimum, include:

1. Specific objectives and practices for trail management;

2. Identification of all significant natural, historical and cultural resources to be preserved;

3. Anticipated cooperative agreements;

4. Identified carry capacity;

5. Plan for implementing the carrying capacity.

At the outset, it is important that the "nature and purposes" of the trail is established so that the regulation of activities on the trail are compatible. See NSTA Section 7; 16 U.S.C. §1246 (c).

Established carrying capacity should be a measure that may be subject to adjustment over time as the information base is refined. The comprehensive plans are normally revisited by the agency and established trail associations to ensure outlined trail objectives are being met and whether instituted measures are still sufficient in protecting the ecological integrity of the trails and surrounding area.

### B. Pacific Northwest Trail Designation and Agency Failures

The PNT was first proposed in the 1970s by Ron Strickland, founder of the Pacific Northwest Trail Association. AR 00586. In 1976, Congress authorized a study to determine the feasibility and desirability of constructing the Pacific Northwest Trail (PNT). The study was conducted jointly by the National Park Service and USFS. AR 00130-00132.

The 1980 Feasibility Study proposed four alternatives: (1) the most scenic route, (2) the least costly route, (3) the route having the minimum environmental impact, and (4) no trail. The study concluded that the PNT "would have the scenic and recreational qualities needed for designation as a National Scenic Trail, but concluded that its construction was neither feasible nor desirable and recommend the "no trail" alternative. In conjunction with financial concerns, the study noted

that "there would be significant environmental impacts on the grizzly bear and on fragile and frequently over-utilized high elevation areas." AR 00244. Such significant impact would result from increased human use, where "confrontations with the bear are inevitable and all too frequently it is killed or driven from its range." AR 00266.

Approximately 18 years later, Senator Cantwell and Senator Murray introduced senate bill S.2934 to amend the NTSA to designate the PNT. AR 00698. On June 17, 2008, the Senate Committee on Energy and National Resources, National Parks Subcommittee held a hearing on S. 2934. At this hearing the Department of Interior testified that an update to the feasibility study was necessary because so much has changed since the 1980 and "[a]n updated feasibility study would allow the agencies to consult the public as well as the states, counties, municipalities and private landowners who own portions of the underlying route, and complete an analysis under the National Environmental Policy Act." AR 00710. On March 30, 2009, in spite of this recommendation, designation of the trail was added as a rider to the Omnibus Public Land Management Act and was signed into law designating the PNT. AR 00998.

Although more than 11 years have passed, to date, neither an updated feasibility study, nor the statutorily mandated comprehensive plan have been conducted.

## C. PNT Impacts to Grizzly Bear

In 1975, the Service listed the grizzly bear as a threatened species in the contiguous United States. AR 02274. Subsequent Recovery Plans identified six grizzly bear recovery zones: Cabinet Yaak Ecosystem (CYE), Northern Continental Divide Ecosystem (NCDE), Selkirk Ecosystem (SE), Bitterroot Ecosystem (BE), North Cascades Ecosystem (NCASC), and Yellowstone Grizzly Bear Ecosystem (YGBE). AR 02269. Two of these remnant and isolated grizzly bear populations are found in the Cabinet-Yaak Ecosystem of northwestern Montana and northern Idaho. AR 01459-01460.

Due to their late age at first reproduction, small litter sizes, and the long interval between litters, grizzlies have one of the lowest reproductive rates of terrestrial mammals. AR 02276. Roads and high-use trails pose a threat to grizzly bears because they provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental shootings and subsequent poaching. AR 01501. Direct human interaction is significantly more dangerous for female grizzly bears and incidental human-caused mortality can substantially affect the population's ability to grow. AR 01475.

Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers. AR 01508. Roads and high-use human access also result in indirect

mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions. AR 01508. This type of displacement may have long term effects that are particularly problematic for female grizzly bears attempting to reproduce. A 01525.

These threats are most prevalent due to the location of the PNT's designated route. Over 50% of the 1156-mile designated route will pass through four of the six U.S. Grizzly Bear Recovery Zones. AR 04942. Specifically, 76 miles, or 7 percent, will pass through the Cabinet Yaak recovery zone ("CYGBRZ"). AR 04935, 04955. Within the CYGBRZ, the PNT route will pass through three Bear Management Units (BMUs) with demonstrated occupancy by female grizzly with young. AR 04943. BMUs are majorly composed of core grizzly habitat and approximates the size of a female grizzly bear home range. [1] The IGBC Taskforce identified the need to establish "core areas" that provide some level of secure habitat. AR 01507. Core areas include high quality habitat within a BMU that contain no motorized travel route or high use or "non-motorized high intensity trails." AR 01441. USFS defines "non-motorized high intensity trails" as those with "averages greater than 20 parties per week of non-motorized use." AR 01896.

---

[1] The programmatic FSEIS of the 2001 Forest Plan Amendments for Motorized Access Management within Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones established BMUs. A priority objective is to achieve a level of 55% of core area habitat in BMUs. AR 01437.

The PNT was deliberately routed to include as many higher elevation scenic mountains as possible in the northern Yaak. AR 04941. This means a higher degree of overlap with summer, fall and den habitats will occur than if alternate routes at lower elevations would have been chosen. AR 04943. The northern Yaak BMUs have the most female grizzlies with young occupancy compared to the southern Yaak, likely reflective of higher value seasonal habitats and less human disturbance. AR 094942. Telemetry studies indicate some female grizzly bear home ranges have concentrated activities in the northern PNT. AR 094942. Displacement of these female grizzly bears from preferred habitat can impair reproductive rates and threaten survivability of the species.

It was estimated that 100 thru-hikers attempted the PNT without the completion of a comprehensive management plan. AR05823. The undisputed evidence in the record demonstrates that continued and increased use of PNT will likely result in displacement of grizzly bears from critical habitats, with a high potential for significant adverse effects on survival and population recovery of the threatened Yaak grizzly bears. AR 04944.

## STANDARD OF REVIEW

The NSTA does not provide a citizen suit provision nor does it provide a standard for judicial review. The Administrative Procedures Act's (APA) general provisions for judicial review of agency actions therefore apply. The APA

requires administrative agencies to complete required tasks "within a reasonable time" and empowers reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 555(b), 706(1); see also *Telecommunications Research & Action v. FCC (TRAC)*, 750 F.2d 70, 77 (D.C. Cir. 1984) (the APA indicates a Congressional intent that agencies act within reasonable time frames and that courts play an important role in compelling agency action that is unreasonably delayed). A claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take." Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64, 124 S. Ct. 2373, 2379, 159 L. Ed. 2d 137 (2004). "[W]hen an agency is compelled by law to act within a certain time period… a court can compel the agency to act[.]" *Id.* at 65.

When a district court reviews an agency decision, summary judgment is the "appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Hunters v. Marten*, CV 19-106-M-DLC, 2020 WL 3577086, at *5 (D. Mont. July 1, 2020), citing *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985)). "In an APA case, however, the summary judgment standard is modified by the APA. The burden shifting framework is inapplicable as the burden always remains with the plaintiff." *Id.,*

citing *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 281 (D.N.M. 2015). "And, because a court's review is limited to the record (absent narrow exceptions), the typical case does not involve factual disputes." *Id.,* citing *Hispanic Affairs Project v. Acosta*, 263 F. Supp. 3d 160, 171 (D. D.C. 2017), overruled in part on nonrelevant grounds by *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018).

<u>ARGUMENT</u>

**A. The Service's failure to prepare a comprehensive management plan nearly eleven years after the PNT was designated is an unreasonable delay.**

To determine whether agency inaction amounts to an "unreasonable delay" courts balance the following six TRAC factors: (1) the amount of time agencies take to make decisions which must be governed by a rule of reason; (2) whether Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the effect of expediting delayed action on higher or competing priorities; (5) the nature and extent of the interests prejudiced by the delay; and (6) the recognition that a court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed. *Brower v. Evans*, 257 F.3d 1058, 1068 (9th Cir. 2001) (citing *Independence Mining Co. v. Babbitt*, 105 F.3d

502, 507 n.7 (9th Cir. 1997) and *TRAC*, 750 F.2d at 80).

Application of the six TRAC factors to this case reveals the Service's failure and refusal to prepare a comprehensive management plan for the Pacific Northwest Trail nearly eleven years after the trail was designated is unreasonable.

### 1. Eleven years is unreasonable

The amount of time an agency takes to make a decision is the "most important" factor in a TRAC analysis. *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). "The ultimate issue" is whether the time the agency takes to act satisfies the rule of reason. *Mashpee Wampanoag Tribal Council Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). In determining the appropriate timeline for agency action, the Ninth Circuit has instructed district courts to follow a standard of reasonableness. *Envtl. Def. Ctr. v. Babbitt,* 73 F.3d 867, 872 (9th Cir.1995); *see also Ctr. for Biological Diversity v. Norton,* 304 F.Supp.2d 1174, 1184 (D.Ariz.2003). The reasonableness of time for agency action is typically measured in months, occasionally a year or two but not several years or a decade. *In re American Rivers and Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (citations omitted).

While the NSTA mandates CPs be completed "within two fiscal years," the average completion time is about 47 months (less than 4 years). AR 00619; See also AR 00636-00637. The longest time for completing a CP has been 88 months

(about 7.5 years). AR 00638. The delay in a CP for the PNT has been over 141 months, nearly double that timeframe.

Here, nearly eleven years after Congress designated the PNT, and the USFS has yet to prepare a comprehensive management plan. Plaintiffs are unsure of what, if anything, has been accomplished over these 11 years. On November 10, 2009, the USDA designated Pacific Northwest Region (Region 6) the lead role to administer the PNT. This was the initial commencement of the CP process. AR 01342. On February 27, 2013, the USFS provided a Draft Comprehensive Management Plan Outline consisting of two pages and devoid of any substantive information regarding the plan. AR 03949-03950. In June of 2013, the USFS provided the Advisory Council a "Planning schedule" with a timeline for preparing a CP and engaging in the NEPA process. AR 03946. This document anticipated the Draft Biological Assessment and Environmental Impact Statement would be available for public comment by October of 2015, with the final CP/EIS completed by May of 2016. AR 03946. This never occurred.

The USFS also failed to initiate a FACA Charter until 2013, AR 03991-03995, and subsequently let the charter go inactive from September 7, 2018 to March 10, 2020. AR 06237-06241. During the four-year period when the Advisory Council was active, only three meetings were held. AR 06171. Out of these meetings came three versions of a draft CP. A comparison of the three "Draft

Pacific Northwest National Scenic Trail Comprehensive Plan Outline" is informative as to exactly how much has been accomplished over these last 11 years. See AR 033949-03950 (Yr 2013); AR 04472-04475 (Yr 2015); AR 04922-04925 (Yr 2017). The USFS' lack of commitment to completing the CP is highlighted by its failure to establish and maintain the statutorily required advisory committee.

## 2. Congressional timetable.

The second TRAC factor is whether Congress provided a timetable or other indication of the speed with which it expects the agency to proceed. Brower, 257 F.3d at 1068 (citation omitted). The "statutory scheme may supply content for this rule of reason." Id. Inordinate agency delay cannot be allowed to frustrate congressional intent. *In re Int'l Chemical Workers*, 958 F.2d at 1149 (citation omitted).

Based on the language of the statute, Congress made the statutory timetable clear: "***within two complete fiscal years*** of the date of enactment of legislation designating…the Secretary ***shall***…submit…a comprehensive plan[.]" 16 U.S.C. §1244 (e)/(f). Congress was not willing to give the USFS flexibility and discretion when it came to a timeframe for developing a comprehensive plan. That is not to say that historically the administrating agencies' and the Secretary have always met that deadline. As discussed above, National Parks Service (NPS) internal

guidance documents interpreted two complete fiscal years as the range of 24 to 36 months with only 6 out of the 18 (33%) trails with finalized CPs completed the within the prescribed timeframe. AR 00619. This does not mean, however, that Congress intended the USFS to ignore its deadline in such an egregious manner.

### 3. Delay, in the context of ensuring the conservation of threatened species, is less tolerable.

The third TRAC factor notes that delays, that might be reasonable in the sphere of economic regulation, are less tolerable when human health and welfare are at stake. *Brower*, 257 F.3d at 1068 (citation omitted). The USFS's failures fall neither into the economic realm nor specifically into the realm of human health and welfare. However, the agency's failure involves environmental injury: USFS failure to prepare a comprehensive management plan for a designated National and Scenic Trail. More specifically, the failure to prepare a comprehensive management plan containing adequate management objectives and assigned carrying capacity for a trail that bisects four of the six U.S. Grizzly Bear Recovery Zones, including core habitat for the Cabinet-Yaak population.

In 1999, FWS found that the Cabinet-Yaak grizzly population was "in danger of extinction" due in part to the habitat alteration and human disturbance related to the impacts of timber harvest and its associated road construction. 64 Fed. Reg. 26732. Today, more than twenty years later, the Cabinet-Yaak grizzly

population is still facing these same threats. This was addressed by this Court in which it was found that the population was warranted for uplisting from "threatened" to "endangered." *Alliance. for the Wild Rockies v. Zinke*, 265 F.Supp.3d 1161, 1182 (D. Mont. 2017). The status of the Cabinet Yaak grizzly population is dire. Delay in producing a CP and conducting the proper NEPA analysis may be severely detrimental to the survival of the species.

USFS's failure adversely impacts the conservation and recovery of a fragile and declining population. The Cabinet Yaak faces recurring violations of the Access Amendments including illegal road use and increased linear road miles further impacting the species in ways not previously analyzed. *See Alliance for the Wild Rockies v. Probert et al.* 412 F. Supp. 3d 1188 (D. Mont. 2019).

With continued threats to critical habitat, it is imperative that the USFS complete a comprehensive plan and NEPA analysis of this increased trail usage. To date there has been no analysis on how the PNT will affect the increase of human presence and the resulting impacts on the Cabinet-Yaak population. Presumably, the impacts identified could then be cured through a determined carrying capacity as prescribed under Section 5 (e). 16 U.S.C. 1244 (e)

USFS's nearly twelve-year delay is not only an added threat to the listed species but is also a serious disservice to the public. The public also has a significant interest in the preparation of a comprehensive management plan, as it

will ensure the public that the USFS is properly managing the trail to enhance such important significant natural, historical, and cultural resources.

### 4. Higher priorities.

The fourth TRAC factor considers the effect of expediting delayed action on agency activities of a higher or competing priority. *Brower*, 257 F.3d at 1068 (citations omitted). While higher priorities can justify agency delays, *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987), any asserted justifications for the delay "become less persuasive the longer the delay continues," *In re Int'l Chemical Workers Union*, 958 F.2d at 1150.

There is a long history of federal agencies downplaying the dire threat to the Cabinet-Yaak population. Preservation of endangered species, like the Cabinet-Yaak grizzlies, takes "priority over the 'primary missions' of federal agencies." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 187 (1978). It was the intent of the ESA to "halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

Thus, the government must "afford[] endangered species the highest of priorities" and act with "institutionalized caution" regarding these species. *Cottonwood Envtl. Law Ctr. v.USFS*, 789 F.3d 1075, 1091 (9th Cir.2015). Moreover, reviewing courts must "give the benefit of the doubt to the species." *Connor v. Burford*, 848 F.2d 1441,1454 (9th Cir.1988). As this Court has

previously held, this means that a "tie in the evidence should go to the species . . ." *Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 390 F.Supp.2d 993, 1008 (D. Mont. 2005).

While this action is brought primarily under APA, the importance of prioritizing species listed under the ESA, as stated by the Supreme Court, should not be lost in analyzing the agency's failure to complete a comprehensive management plan for a trail located in core grizzly habitat. Nothing in the record indicates USFS's reasons for delay nor has the USFS expressed the priority status of the CP.

### 5. The interests prejudiced by delay.

The fifth TRAC factor, which takes into account the nature and extent of the interests prejudiced by the delay, overlaps with the third factor. *Independence Mining Co.*, 105 F.3d at 509. As mentioned earlier, *see supra* Section A. 3., the importance of a comprehensive management plan and NEPA analysis cannot be overstated. As the PNT begins to gain more popularity it is imperative that key questions are answered. USFS has acknowledged that the PNT poses some threat to the fragile Cabinet-Yaak, including "human-grizzly conflicts." AR 05093.

The current long-distance use of the PNT has averaged around 65 people a year, however it is anticipated that this number could grow to 400 people per year. AR 05092. This is a substantial increase from its current use. In 2012, the Cabinet-

Yaak population was estimated to have 18-22 bears. AR 04955. Between 2009-2014, the number of females with cubs averaged 2.5 per year, while human caused mortality averaged 1.5 bears per year. AR 04955. This amounts to a death rate of 0.3 females per year. AR 04955. As an extremely small, isolated population, this female death rate can be devastating. Any increase in these human-grizzly conflicts could seal the fate of this species.

Delaying management directives and an establish carrying capacity could be a matter of life or death for a Cabinet-Yaak grizzly bear.

### 6. Evidence of impropriety not required.

The sixth TRAC factor is pertains to whether any impropriety or bad faith is "lurking behind" the Service's lassitude. *Brower*, 257 F.3d at 1068 (citation omitted). Such impropriety or bad faith is not required in order to hold that agency action is unreasonably delayed but if found the "agency will have a hard time claiming legitimacy for its priorities." *Independence Mining*, 105 F.3d at 510. Plaintiffs are not alleging any impropriety or bad faith in this case.

### B. The Forest Service may not rely on Kootenai National Forest Plan for PNT projects without initiating Section 7 Consultation

On June 3, 2019, Plaintiffs sent a letter to the USFS requesting that the agency "suspend Pacific Northwest Trail (PNT) related activities" in the KNF

citing the lack of a management plan, environmental review and location concerns. AR 05518.

In response to this letter, the USFS stated "Kootenai Forest Plan guides our management of the congressionally designated PNT. The comprehensive planning process for the PNT allows the KNF to continue to carry out its management responsibilities along the PNT (signing, maintenance, or site-specific projects) concurrently." Dkt No. 1 Exhibit B USFS Ltr Forest Supervisor (dtd 07/08/19).

While Plaintiffs concede the NSTA allows for the KNF to carry out its management responsibilities concurrently, site-specific projects pertaining to the PNT are outside of the scope of analysis conducted in the Access Amendments, Revised KNF Forest Plan and KNF Forest Plan Revision's Biological Opinion (2013 BiOp). AR 02265-02388. None of these management plans address the adverse effect of the PNT, particularly increased human use of the PNT route in the high-alpine regions of the KNF and resulting impacts from increased trail access in core grizzly bear habitat.

USFS' reliance on the KNF Forest Plan for PNT projects is also in violation of ESA Section 7. The ESA obligates federal agencies "to afford first priority to the declared national policy of saving endangered species." *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084–85 (9th Cir. 2005) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185, 98 S.Ct. 2279,

57 L.Ed.2d 117 (1978)). Section 7 of the ESA directs each action agency to ensure, in consultation with the Fish and Wildlife Service, that "any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species" or cause the "destruction or adverse modification" of habitat designated as "critical" for such species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).

Here, the USFS formally consulted with the Fish and Wildlife Service in developing the Revised KNF Forest Plan, and the Fish and Wildlife Service issued a Biological Opinion. See AR 02265-02388. The Fish and Wildlife clearly defined the scope of its analysis stating:

> Except in the case of the motorized route densities and over-snow motorized use, this biological opinion **does not provide an analysis for effects of specific actions**. Rather, analysis is a broadscale examination of the types of projects and activities conducted under the Revised Plan that could potentially occur in grizzly bear habitat and result in effects on grizzly bears.
>
> Because of the broad-scale analysis, the **KNF is responsible for section 7 consultation on all future projects (conducted under the Revised Plan) that may affect the grizzly bear or its habitat, even if those projects are consistent with Revised Plan.**

AR 02317 (emphasis added). Based on 2013 BiOp, any project outside of motorized route densities and over-snow motorized use, would require the USFS to initiate consultation. Therefore, any PNT related site-specific project may not

occur until USFS initiates Section 7 consultation. Furthermore, this clearly obligates USFS to initiate consultation if and when they develop a CP. Plaintiff request an order from this Court commanding and enjoining the same.

Finally, increased use of the PNT may conflict directly with the Access Amendments and KNF Forest Plan. As designated, 76 miles of the PNT passes through Cabinet Yaak BMUs. AR 04955. Increased use may exceed the IGBC task force standards for non-motorized levels of "high-intensity trail" use of 20 or more parties per week for core area grizzly bear calculations. The impacts of high use trails have never been truly analyzed. In fact, the 2011 Access Amendment Biological Opinion (2011 BiOp), chose not to consider the effects of high-use trail stating:

> According to the Draft Supplemental EIS for motorized access management in the CYE and SE, high-use trails are counted against calculations of "percent core area." Because of this consideration of the effects of high use trails on grizzly security and the management of this security we do not consider the current levels of recreational use in the CYE and SE a threat to grizzlies at this time.

AR 01495. In making this conclusion, the Fish and Wildlife relied on estimated visits from 2002 and 2003. The BiOp acknowledged that half of these visits occurred in the "Forest's north zone, which includes the SE and CYE recovery zones." AR 01495. Now, sixteen years later there is still no analysis of the effect of high use trails on grizzly security, yet the USFS continues to promote and support

the increased attendance of humans in core habitat. It is predicted that use of PNT through the Yaak will at some point reach and exceed high-intensity trail standards. AR 04941. Without a CP, the analysis of the trails capacity and resulting impact on grizzly population is unknown.

USFS has continued to shirk its statutory obligations in protecting the Cabinet-Yaak grizzly population. USFS has illegally relied on the KNF Forest Plan in managing PNT projects, failed to initiate Section 7 consultation in accordance with the ESA and continues to promote the use of the PNT without a CP. Accordingly, Plaintiff requests an order from this court commanding USFS to engage in Section 7 consultation for any PNT related project, including its preparation of the CP.

### C. This Court should enjoin the Forest Service from promoting the use of the PNT as a thru-hike until a Comprehensive Plan has been completed.

Plaintiff also moves this Court for summary judgment on its claim for injunctive relief because the undisputed facts establish that the Service has failed to study and plan for the impacts of the trail and therefore, cannot reasonably protect the natural resources it bisects. In spite of this failure, USFS continues headlong to advertise, promote, and otherwise direct the entire world (via the world wide web) to come hike, camp, and use the PNT. While the Service will undoubtedly argue these actions are consistent with its obligations to "manage" and "administer" the

trail, neither of those obligations require the starkly imprudent actions of the Service here. Instead, the law requires the opposite.

Although its website contains tremendous amounts of "how to" information, such as maps, interactive guides and permit information, nowhere does the Service inform the public of the following: (1) it has no guiding plan for administration of the trail; (2) the trail, as designated, crosses numerous core habitat designations for endangered CYE grizzlies; and (3) caution and limitation of use/impact is requested until the Service has a Comprehensive Plan in place. Furthermore, the Service's PNT website contains no information regarding CYE grizzlies. In place of this information, the Service sends would-be-hikers to its affiliate's website – the Pacific Northwest Trail Association. (www.PNTA.org). Once there, an even greater multi-media display greets interested hikers. While, beautiful images and interactive planning resources abound, visitors to these websites have no idea that the experience being advertised is essentially a free-for-all, tragedy of the commons. At the losing end of this interaction is a tiny population of endangered bears, whose protection has been mandated by the ESA.

For these reasons, Plaintiff meets the test for injunctive relief. More specifically, under "well-established principles of equity," a plaintiff seeking permanent injunctive relief must satisfy a four-factor test by showing:

(1) that it likely to suffer an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

These "well-established" principles include special consideration for situations involving endangered species. More specifically, "[t]here is no question, as firmly recognized by the Supreme Court, that the ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted." *Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015), citing *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 543, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (explaining that the ESA "foreclose[s] the traditional discretion possessed by an equity court"). The seminal case *TVA v. Hill* held that courts do not have discretion to balance the parties' competing interests in ESA cases because Congress "afford[ed] first priority to the declared national policy of saving endangered species." *Id.* citing, *Hill* at 437 U.S. at 185, 98 S.Ct. 2279. *Hill* also held that Congress established an unparalleled public interest in the "incalculable" value of preserving endangered species. Id. at 187–

88, 98 S.Ct. 2279. It is the incalculability of the injury that renders the "remedies available at law, such as monetary damages ... inadequate." See *eBay*, 547 U.S. at 391, 126 S.Ct. 1837; see also *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages...."); *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999 (9th Cir. 2009) (same).

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Nat. Resources Def. Council, Inc. v. Evans,* 279 F. Supp. 2d 1129, 1188 (N.D. Cal. 2003), citing *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 at 545, 107 S.Ct. 1396, 94 L.Ed.2d 542; *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir.1988). "If such injury is sufficiently likely, therefore, the balance of the harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396; see also *Sierra Club*, 843 F.2d at 1195; *National Parks & Conservation Ass'n*, 241 F.3d at 731 n. 8 (issuance of a preliminary injunction for a NEPA violation was justified under both the traditional balancing test and under then-circuit Judge Breyer's explanation in *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir.1989) that the harm under NEPA is uninformed decision making which increases the risk to the environment).

The 9th Circuit undertook this analysis in *Cottonwood* as a result of the

Supreme Court's decisions in *Winter v. Natural Resources Defense Council, Inc.*,

555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), and *Monsanto Co. v. Geertson*

*Seed Farms*, 561 U.S. 139, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). Based on

those decisions, the 9th Circuit overturned its previous holding (as establish by

*Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir.1985)) that there exists a

presumption of irreparable injury as a result of procedural violations under NEPA.

More specifically, the 9th Circuit held in *Cottonwood* that "[w]e must therefore

conclude that there is no presumption of irreparable injury where there has been a

procedural violation in ESA cases. A plaintiff must show irreparable injury to

justify injunctive relief. In light of the stated purposes of the ESA in conserving

endangered and threatened species and the ecosystems that support them,

establishing irreparable injury should not be an onerous task for plaintiffs.

*Cottonwood*, 789 F.3d 1075, 1091 (9th Cir. 2015), citing 16 U.S.C. § 1531.

However, the 9th Circuit made clear that *Cottonwood's* decision to eliminate

the presumption of injury did not alter the unevenly weighted balance of equities in

cases involving endangered species. In doing so, the *Cottonwood* court held:

> our opinion does nothing to disturb the Supreme Court's holding in *Hill*
> that when evaluating a request for injunctive relief to remedy an ESA
> procedural violation, the equities and public interest factors always tip
> in favor of the protected species. As the Court made unmistakably clear:
> 'Congress has spoken in the plainest of words, making it abundantly
> clear that the balance has been struck in favor of affording endangered

species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.' *Hill*, 437 U.S. at 194, 98 S.Ct. 2279. That fundamental principle remains intact and will continue to guide district courts when confronted with requests for injunctive relief in ESA cases.

Plaintiff asserts that "institutionalized caution", in the context of this case, necessitates this Court enjoining the Service from its continued, unbridled, advertisement and promotion of the trail. The undisputed facts in the record establish that:

> "recreational use of the … PNT northern route in the Yaak—passing as it does for much of the way through higher elevation summer, fall, and winter den habitat—will have a serious negative effect on grizzly bears through displacement from high quality habitats during hyperphagia and even during winter denning, with the potential for reduced survival that could impact the grizzly bear recovery program." AR 4971.
>
> …
>
> In a comprehensive review of the impacts of human recreation on brown bears, Fortin et al. (2016) used empirical studies and expert knowledge to suggest that human displacement is the primary mechanism by which bears are impacted. They note that displacement from concentrated food resources often occurs during hyperphagia and this may affect the health, reproduction, and survival of bears because of a loss of nutritional intake and increased energetic costs. AR4974.

In addition, Judge Christian previously analyzed impacts to this specific population of grizzly bears in *All. for the Wild Rockies v. Zinke.* 265 F. Supp. 3d 1161, 1169 (D. Mont. 2017). There, the court found that "due to the population's small numbers, Cabinet–Yaak bears are particularly

"vulnerable to stochastic (i.e., random) events." (Id. at 17.) Specifically,

fatalities caused by human hands—2.3 per year between 1999 and 2008—

represented a primary threat to the bear's recovery." *Id.*  Such fatalities have

continued to plague this population of bears and ultimately was one of the

factors which resulted in the considered uplisting of the Cabinet-Yaak

grizzly bear population from threatened to endangered. That determination

was reaffirmed in a June 2014 assessment which found:

> Despite ... improvements, the [Cabinet–Yaak ecosystem] still faces
> threats that put the population at significant risk. The extremely small
> population size (< 50 individuals) makes this population very
> vulnerable to human-caused mortality. While the population trend has
> changed from declining to stable, it will take several years of a
> positive trend to provide us with assurance the population is truly
> recovering.

Because the Service has not conducted a Comprehensive Planning

process, a NEPA analysis, Section 7 ESA consultation, or any other site-

specific planning, there exists nothing in the record to refute this strong

scientific evidence.  As a result, this Court should consider these facts

undisputed.  With no dispute as to these material facts, Plaintiff is entitled to

judgment as a matter of law on the issue of injunctive relief.

Such injunctive relief may take several forms and Plaintiff encourages

this Court to narrowly tailor its order to the specific facts and circumstances

at issue here.  To that end, Plaintiff recognizes that the Service has a legal

obligation to acknowledge the existence of the Trail and to provide information to the public regarding that existence. However, given the lack of environmental analysis here and the fragility of the species and habitat at issue, this Court should require the Service to do the following:

1. inform the public of its statutory and regulatory failures to act;
2. inform the public of the specific risks to CYE bears from increased human presence in the CYE portion of the Trail;
3. provide maps identifying the CYE bears' designated core habitats within the BMUs bisected by the trail;
4. request that the public avoid camping on or using "spur trails" or non-congressionally designated sections of "side trails" that fall within CYE bears critical habitats; and
5. request that its affiliate partner, Pacific Northwest Trails Association, do the same.

## REMEDIES

For the foregoing reasons Plaintiffs request this Court grant the following remedies:

i. Declare that the Forest Service's nearly eleven-year delay in preparing a comprehensive management plan to be an unreasonable delay in violation of NSTA and APA.

ii. Compel the Forest Service to produce a develop and implement a comprehensive management plan by December 31, 2021.

iii. Order the Forest Service to initiated ESA Section 7

consultation with the Fish and Wildlife in development of comprehensive management plan.

      iv. Order the Forest Service to conduct full NEPA analysis in conjunction with the development of comprehensive management plan.

      v.  Grant injunctive relief as requested in Section C. 1-4.


Respectfully submitted on this 2nd day of October, 2020.

> */s/ Emily F. Wilmott*
> Emily F. Wilmott
> Graham Coppes
> FERGUSON LAW OFFICE, PLLC
> PO Box 8359
> Missoula, Montana 59807
> (406) 532.2664
> (406) 532.2663
> emilyw@fergusonlawmt.com
> grahamc@fergusonlawmt.com
>
> *Attorney for Plaintiff*

## CERTIFICATE OF WORD COUNT COMPLIANCE

In compliance with Local Rule 7.1(d)(2)(A), I hereby certify that this brief contains 6,927 words, excluding caption, certificate of compliance, and certificate of service.


*/s/ Emily F. Wilmott*
Emily F. Wilmott

Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court via CM/ECF system, which will provide service to counsel for the parties.

*/s/ Emily F. Wilmott*
Emily F. Wilmott

Attorney for Plaintiff